William J. Honan (WJH 1922)
Christopher R. Nolan (CRN 4438)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

07 CV 3854

**JUDGE HOLWELL**

ATTORNEYS FOR PLAINTIFF
DOLPHIN DRILLING LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DOLPHIN DRILLING LTD.,

           Plaintiff,

    -against-

EQUATOR EXPLORATION LTD.,

           Defendant.

---

07 Civ. _____ (____)

**VERIFIED COMPLAINT**

---

Plaintiff, Dolphin Drilling Ltd. ("Dolphin"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Equator Exploration Ltd. ("Equator"), alleges upon information and belief as follows:

1.     This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.     At all times material herein, plaintiff Dolphin was and is a business entity organized and existing under the laws of England, with its principal place of business at Howe Moss Drive, Kirkhill Industrial Estate, Dyce Aberdeen AB21 0GL Scotland.

3.     Upon information and belief, at all times material herein, defendant Equator was and is a business entity organized and existing under the laws of the British Virgin Islands, with its correspondence office at 192 Sloane Street, London SW1X 9QX United Kingdom.

4.     On or about February 6, 2006, Equator and Dolphin entered into a contract for the crewing of, and supplying of maritime equipment for, an oil drilling rig located offshore the coast of Nigeria, approximately forty miles West of Port Harcourt, a marine port which is the center of Nigeria's oil industry (the "Contract").  The exact coordinates of the oil drilling rig are Latitude 004° 39' 2" North; Longitude 005° 04' 4" East.  A copy of the Contract (save the schedules to the Contract which are not included because of their size) is annexed to this Complaint as Exhibit 1.

5.     Under the terms of the Contract, Dolphin was to provide properly qualified, trained, and experienced crew to perform duties in connection with the maritime commercial venture involving drilling operations for oil.

6.     The Contract also required Dolphin to provide a sophisticated, semi submersible oil drilling unit called the "Bulford Dolphin," along with materials and equipment for its continued use.  Dolphin was also responsible under the Contract for such maritime-related activities as *inter alia*, the supervision of towing, ballasting, and anchoring operations, along with the transportation of its personnel to Equator's shore base, and others.

7.     The daily hire rate to be paid by Equator to Dolphin for services rendered was $194,750, (the "Operating Rate"), or a percentage of the Operating Rate based on the circumstances of the day, i.e., stand-by (98% of the Operating Rate), repairs (96% of the Operating Rate), moving equipment, (98% of the Operating Rate) Force Majeure (80% of the

Operating Rate) and the Force Majeure Rate after seven days (50% of the Operating Rate), among others (collectively, the "Day Rate").

8.     Equator was responsible under the Contract for such maritime-related activities and equipment as *inter alia*, a sea bottom survey, radar-reflecting buoys, the supplying of vessels (including anchor-handling main towing vessels), marine transportation, ROV equipment and services, and others.

9.     With respect to its financial obligations, Equator was required to maintain $20,000,000 with the Royal Bank of Canada during the Contract.  In addition, Equator was responsible for making a partial advance payment of $3,000,000 for the Day Rate on the first working day of each month to Dolphin, with any deductions and other reconciliations to be deducted by Dolphin from its invoice for that month.

10.     Under the terms of the Contract, disputes between Dolphin and Equator may be submitted to voluntary Alternative Dispute Resolution ("ADR") in London or a party may file an action in the English courts.  The Contract is to be interpreted in accordance with English law.

11.     On  or about January 30, 2007, the Contract commenced when the drilling unit was ready to be towed to the first oil well for oil drill exploration (the "Actual Commencement Date").  The Contract was for a term of twelve months commencing from the Actual Commencement Date.

12.     Upon information and belief, during the oil well exploration, oil was found off the coast of Nigeria at a drilling well location.  The oil, however, has yet to be extracted from the sea bottom.

3

13.    After the Actual Commencement Date, Dolphin provided notice of Force Majeure to Equator on a few occasions due to a strike affecting drilling operations, kidnapping/hostage situations involving the Dolphin crew, and threatened acts of terrorism against the oil rig.

14.    Equator breached the Contract by failing to pay the remaining Day Rate monies owed for March 2007 (as invoiced on April 2, 2007 and due by May 2, 2007), and monies owed for catering and equipment paid by Dolphin (to be reimbursed by Equator under the Contract). Pursuant to the ten-date termination notice provision in the Contract, Dolphin tendered its notice on May 3, 2007 in writing to Equator and the Contract terminated on May 13, 2007.

15.    As a result of Equator's breach, Dolphin's damages are as follows:

    a.    Catering and equipment monies owed under the Contract: $114,170.24.

    b.    Actual Day Rate for March 2007 ($5,435,797.08) minus the prepayment of the March Day Rate received by Dolphin on March 6, 2007 ($3,000,000): $2,435,797.08.

    c.    Day Rate between May 1, 2007 and May 13, 2007 (13 days at the Force Majeure Rate for threatened acts of terrorism, 50% of the Operating Rate under the Contract): $1,265,875.00; and

    d.    The remaining value of the Contract after termination by Dolphin on May 13, 2007 at the Stand-By Rate under the Contract (98% of Operating Rate [$194,750.00] or $190,855.00), times the remaining days on the Contract (261 days): $49,813,155 – For a total of: $53,628,997.

16.    Under English law, Dolphin also is entitled to receive its interest, expenses and reasonable attorneys' fees for prosecuting its claims to completion, which amount is estimated to be US $15,273,176, as set forth below:

4

Interest:                          $13,273,176 ($4,424,392.20 x 0.0825/year x 3 years)

Attorneys' Fees/Expenses:    $2,000,000

Total:                             $68,902,173

17.     Dolphin is in the process of preparing its claim for ADR or filing suit in England.

18.     Dolphin Drilling Ltd. is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name of Equator Exploration Ltd., which funds are with, upon information and belief, the following financial institutions:  Bank of America, N.A.; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Fortis Financial Groups; Banco Popular; Bank of Tokyo-Mitsubishi UFJ Ltd. or any other financial institution within the Southern District of New York.

19.     While all disputes arising out of the Contract are to be submitted to ADR or Court in England, the action herein is submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

**WHEREFORE**, Dolphin demands judgment as follows:

1.      That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of Equator Exploration Ltd. with the financial institutions noted above in paragraph 18;

2.      That Equator Exploration Ltd. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.    That judgment be entered in favor of Dolphin Drilling Ltd. and against Equator Exploration Ltd. in the amount of US $68,902,173 (including interest, expenses and attorneys' fees); and,

4.    That this Court grant Dolphin Drilling Ltd. such other and further relief which it may deem just and proper.

Dated:    New York, New York
          May 16, 2007

HOLLAND & KNIGHT LLP

By: _____
    William J. Honan (WJH 1922)
    Christopher R. Nolan (CRN 4438)
    195 Broadway
    New York, NY 10007-3189
    Tel:    (212) 513-3200
    Fax:    (212) 385-9010

    *Attorneys for Plaintiff Dolphin Drilling Ltd.*

6

## VERIFICATION

STATE OF NEW YORK          )

                                    :ss.:

COUNTY OF NEW YORK       )

CHRISTOPHER R. NOLAN , being duly sworn, deposes and says:

I am associated with the firm of Holland & Knight LLP, counsel for Dolphin Drilling

Ltd. ("Dolphin), plaintiff in the foregoing action. I have read the foregoing Verified Complaint

and know the contents thereof, and the same are true and correct to the best of my knowledge. I

have reviewed documentation provided to me by Dolphin and corresponded with Dolphin's

representatives regarding this matter. I am authorized by Dolphin to make this verification, and

the reason for my making it as opposed to an officer or director of Dolphin is that there are none

within the jurisdiction of this Honorable Court.

                                    Christopher R. Nolan (CRN 4438)

Sworn to before me this
16th day of May, 2007

               
Notary Public

WALLIS BETH KARPF
Notary Public, State Of New York
No. 01KA6047092
Qualified In New York County
Commission Expires August 28, 20_10_

# 4548480_v1

7

# EXHIBIT 1

# CONTRACT

## between

## EQUATOR EXPLORATION LTD

## and

## DOLPHIN DRILLING LTD

## for

## THE PROVISION OF DRILLING RIG SERVICES ("BULFORD DOLPHIN")

| CONTRACT REVIEW | | |
|---|---|---|
| RECEIVED BY: MARKETING DEPARTMENT | | |
| DATE RECEIVED: | REF No. | |
| CLIENT: EQUATOR | UNIT(S) NAME: Bulford | |
| REVIEWED BY: | DATE: | INITIALS: |
| SVP MARKETING | 6/2/06 | IPH |
| UNIT MANAGER | 6/2/06 | DHG |
| FINANCE MANAGER | 6/2/06 | DCC |
| | | |
| | | |

# CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Definitions and Interpretation | 4 |
| 2. | Commencement and Duration and Options | 9 |
| 3. | Mobilisation and Demobilisation | 9 |
| 4. | Appointment of Contractor and Company Representative | 10 |
| 5. | Drilling Operations | 11 |
| 6. | Equipment, Supplies and Services | 14 |
| 7. | Personnel | 17 |
| 8. | General Responsibilities of the Contractor | 19 |
| 9. | General Responsibilities of the Company | 23 |
| 10. | Compensation | 24 |
| 11. | Invoicing and Payment | 27 |
| 12. | Customs, Duties and Taxes | 28 |
| 13. | Liabilities and Indemnities | 29 |
| 14. | Consequential Loss | 34 |
| 15. | Insurance | 34 |
| 16. | Force Majeure | 36 |
| 17. | Confidentiality | 37 |
| 18. | Intellectual Property Rights and Patent Infringement | 37 |
| 19. | Assignment and Subcontracting | 38 |
| 20. | Records and Audit | 39 |
| 21. | Termination and Amendment of Contract | 39 |
| 22. | Suspension of Drilling Operations | 41 |
| 23. | Notices | 41 |
| 24. | Co-venturers | 43 |
| 25. | Variation | 43 |
| 26. | Other Conditions | 43 |
| 27. | Compliance with Law | 43 |
| 28. | Permits and Licences | 44 |
| 29. | Independent Contractor | 44 |
| 30. | Waiver | 44 |
| 31. | Business Standards | 45 |
| 32. | Local Content | 46 |
| 33. | Governing Law | 46 |
| 34. | Arbitration | 46 |
| 35. | Survival | 47 |
| 36. | Entire Agreement | 47 |
| | Signature Page | 47 |

**Schedules**

1.   Drilling Unit Specification and Equipment List

     a)   Drilling Unit Description and Inventory                    48

     b)   Rig Commissioning                                          122

     c)   Equipment and Operating Standards                         123

2.   Additional Services and Equipment to be Provided by Contractor   128

3.   Personnel, Equipment, Materials, Supplies and Services to be supplied by
     Company and/or Contractor                                       129

4.   Contractor Personnel                                            138

5.   Scope of Work and Drilling Sequence                             139

6.   Compensation                                                    140

7.   Health, Safety and Environment Policy                           142

8.   Medical and Catering Requirements                               150

9.   Procedure for offshore Helicopter Refuelling Systems and the Management
     of Offshore Helideck Operations                                 152

PA

**THIS CONTRACT** is made effective the 6th February 2006

**BETWEEN:**

(1)   **EQUATOR EXPLORATION LTD,** a company incorporated in British Virgin Islands and with its correspondence office at 192 Sloane Street London SW1X9QX United Kingdom (hereinafter together with their permitted successors and assignees referred to as "Company")

(2)   **DOLPHIN DRILLING LTD** a company incorporated in England and with its registered office at King's Scholars House, 230 Vauxhall Road, London SW1W 1AU with its principal place of business at Howe Moss Drive, Kirkhill Industrial Estate, Dyce Aberdeen AB21 0GL (hereinafter together with its permitted successors and assigns referred to as "Contractor")

**WHEREAS:**

Company wishes to engage Contractor for a term of 12 months to drill oil wells offshore Nigeria or such other other West African country as the Parties may agree, such agreement not to be unreasonably withheld, and Contractor is willing to accept such engagement on the following terms and conditions.

**NOW THEREFORE IT IS AGREED** as follows:

**1.     DEFINITIONS AND INTERPRETATION**

1.1.   For purposes of this Contract, the following words shall have the meanings hereinafter ascribed to them:

| | |
|---|---|
| **"Actual Commencement Date"** | shall be the date and time the Drilling Unit has its last anchor racked and is under tight tow at the Mobilisation Point and is ready to move to the first Well Location. |
| **"Affiliate"** | means, in relation to either Party, a company or corporation: |

(i)     that is, directly or indirectly, controlled by such Party; or

(ii)    that, directly or indirectly, controls such Party; or

(iii)   that is, directly or indirectly, controlled by a company or corporation that also, directly or indirectly, controls such Party.

For the purposes of this definition, "control" means having the right to exercise or cause the exercise of the vote of 50% or more of all of the voting shares of such company or corporation.

| | |
|---|---|
| **"API"** | means the American Petroleum Institute |
| **"Applicable Law"** | means all laws, statutes, statutory instruments, by-laws, decrees, ordinances, local customs, |

Page 4 of 157

PAD   はん

regulations and directives (including but not limited to Employers' Liability, Workman's Compensation or similar statutory national insurance) which apply with respect to the Contractor in fulfilling its obligations under this Contract and/or the Drilling Operations.

"Air Base"
means the Company's air base at Port Harcourt or Lagos Airport, Nigeria and/or elsewhere as designated by Company.

"Area of Operations"
means offshore Nigeria or such other West African country as the Parties may agree, such agreement not to be unreasonably withheld, anywhere the Drilling Operations are to be conducted. .

"Claims"
means claims, liens, judgments, penalties, proceedings, awards, remedies, debts, liabilities, damages, demands, costs, losses, expenses (including without limitation legal costs and expenses) or causes of action, of whatever nature including, without limitation, those made or enjoyed by dependants, heirs, claimants, executors, administrators, successors, survivors or assigns.

"Company Group"
means the Company, its Affiliates, the Co-venturers and the Company's other contractors.

"Company Group Equipment"
means all equipment, materials, tools, spare parts and other items owned, hired or otherwise in the possession or control of any member of the Company Group, but excludes those items provided by the Contractor and reimbursed by the Company as detailed in Schedule 3.

"Company Group Personnel"
means the directors, officers, employees and agents of the Company Group.

"Company's Representative"
means the representative(s) of the Company appointed pursuant to Clause 4.

"Completion Date"
means the date and time when the Drilling Operations have been completed for all purposes hereunder to the Company's satisfaction in accordance with the Contract, as evidenced in a written notice issued by the Company Representative to the Contractor, being the date and time on which all of the Company Group Equipment has been off-loaded from the Drilling Unit (except as the Parties may otherwise agree) and the Drilling Unit has its last anchor racked and is under tight tow prior to leaving the last Well Location or, if applicable, the date and time when the Drilling

Unit is declared an actual or constructive loss pursuant to any policy of insurance effected by the Contractor pursuant to the provisions of Clause 15.

"Consequential Loss"

means loss of contract, bargain, expectation, opportunity, profit, production, revenue, anticipated cost reduction or interest payable (or any other indirect or consequential loss or damage) howsoever caused, arising out of or in connection with this Contract.

"Contractor Group"

means the Contractor, its Affiliates and the Subcontractors.

"Contractor Group Equipment"

the Drilling Unit and all equipment, materials, tools, spare parts and other items (including those specified in Schedules 1, 2, and 3) owned, hired or otherwise in the possession or control of any member of the Contractor Group, for use in connection with the Drilling Operations.

"Contractor Group Personnel"

means the directors, officers, employees and agents of the Contractor Group. The Contractor Group Personnel shall include (but not be limited to) the personnel listed in Schedule 4.

"Contractor's Representative"

means the representative of the Contractor appointed pursuant to Clause 4.

"Co-venturers"

means all or any companies which, together with the Company, may from time to time have an interest in the exploration and production rights over the Area Of Operations.

"Daily Drilling Report"

means the daily drilling report on the IADC standard form or in such other form as the Company may require pursuant to Clause 5.6.

"Dollars"

means dollars of the United States of America.

"Drilling Operations"

means all drilling and ancillary operations including tripping operations which the Contractor is required to carry out to drill (and, as the case may be, test, complete, sidetrack, suspend and/or abandon) the Wells in strict conformity with the Drilling Programme and this Contract.

"Drilling Programme"

means the drilling programme(s) to be delivered by the Company to the Contractor pursuant to Clause 5.2.

"Drilling Unit"

means the semi submersible drilling unit "Bulford Dolphin" complete with all spare parts, ancillary equipment, tools, materials and

PAD     Whm

services and as further specified in Schedule
1a.

"Force Majeure"

means an occurrence including but not limited
to those listed below which is beyond the
reasonable control, and without the fault or
negligence, of the Party affected, and which
could not have been prevented by the exercise
of due diligence by such Party:

(a)    riot, war, invasion, act of foreign enemy,
       hostilities (whether war be declared or
       not), act of terrorism, civil war, rebellion,
       revolution, insurrection of military or
       usurped power;
(b)    ionising radiation or radioactive
       contamination;
(c)    pressure waves caused by aircraft or
       other aerial devices travelling at sonic or
       supersonic speeds;
(d)    earthquake, flood, fire, explosion and/or
       other natural physical disaster, but
       excluding weather conditions as such,
       regardless of severity;
(e)    strike at a national or regional level or
       industrial dispute at a national or
       regional level, or strike or industrial
       dispute by labour of either the Company
       Group or the Contractor Group and
       which affect a substantial or essential
       portion of the Services; or
(f)    maritime or aviation disaster,

provided that adverse weather conditions
(regardless of severity) and/or the mere
shortage of labour, materials, equipment (or the
breakdown of equipment) or supplies and/or
lack of funds shall not constitute Force Majeure.

"Government"

means the government and governmental
authorities having jurisdiction over the Area of
Operations.

"HSE Policy"

means the health, safety and environmental
policy comprising Schedule 7.

"IADC"

means the International Association of Drilling
Contractors.

"Intellectual Property"

means any patent, copyright, proprietary right,
trademark, know-how, process, invention, and
any other form of discovery (whether or not
patentable or in any other way registrable)
made by any person or entity.

PAD        Whu

| | |
|---|---|
| **"Mobilisation Point"** | means the location of the last well drilled under the Original Contract, being the location from which the Drilling Unit will be mobilised to the first Well Location by the Contractor pursuant to the provisions of Clause 3.1. |
| **"Original Contract"** | means the executed contract effective 18 September 2005 entered into between Peak Petroleum Industries Nigeria Limited, Equator Exploration Limited and Dolphin Drilling Limited for the provision of drilling rig services using the Drilling Unit. |
| **"Operational Period"** | means the period from the Actual Commencement Date to the Completion Date or, if earlier, the date on which this Contract is terminated for any reason. |
| **"Party" or "Parties"** | means the Company and/or the Contractor as the context so requires. |
| **"Subcontractors"** | means those parties to whom the Contractor has subcontracted any part of its obligations under this Contract. |
| **"Supply Base"** | means the Company's supply base in Port Harcourt Nigeria and/or elsewhere as designated by Company. |
| **"Third Party"** | means any person or entity which is not a member of the Contractor Group, Contractor Group Personnel, Company Group and/or the Company Group Personnel. |
| **"Variation"** | means the addition to, the deduction from, or any other way of varying the Drilling Operations in accordance with Clause 25. |
| **"VAT"** | means any taxes in the nature of value added tax, goods and services tax or sales tax. |
| **"Well"** | means any of the wells to be drilled during the term of this Contract in accordance with the Drilling Programme. **"Well Location"** means the location(s) of the Well. |
| **"Working Day"** | means a day on which the clearing banks are open for business in the City of London. |

1.2.    The Schedules referred to in this Contract form an integral part of this Contract. In the event of any conflict between a Schedule and the main body of this Contract, the latter shall prevail. In the event of any conflict between the Schedules, the order of precedence shall be: 1st - Schedule 7, 2nd – Schedule 6, 3rd - Schedule 1, 4th - Schedule 2, 5th - Schedule 5, 6th- Schedule 3, 7th- Schedule 4, 8th – Schedule 8 and 9th- Schedule 9.

1.3.    The Index and any headings used in this Contract are inserted for convenient reference only and shall be ignored in construing the meaning of any of the provisions of this Contract.

1.4.    Where the sense requires, words denoting the singular only shall also include the plural and vice versa. References to persons shall include any company, firm, partnership, joint venture, association, body corporate or individual. Reference to any gender shall include a reference to all other genders.

1.5.    References to statutory provisions shall be construed as references to those provisions in effect at the date of this Contract, as respectively amended or re-enacted or as their application is modified by other provisions (whether before or after the date hereof) from time to time and shall include references to any provisions to which there are re-enactments (whether with or without modification).

1.6.    A person who is not a Party has no right under the Contract (Rights of Third Parties) Act 1999 to enforce any term of this Contract.

## 2.    COMMENCEMENT AND DURATION

2.1    This Contract will commence on and be effective on and from the date hereof and will, unless earlier terminated pursuant to Clause 21, continue in force for a period of twelve (12) months from the Actual Commencement Date. In the event that Drilling Operations on a Well are in progress at the end of said period of twelve (12) months, then the term of this Contract shall be extended until Drilling Operations on such Well are completed.

2.2    Company and Contractor shall maintain a dialogue pending further extensions to the term of this Contract and Contractor shall keep Company informed of any other potential work which may be undertaken by another operator.

## 3.    MOBILISATION AND DEMOBILISATION

### 3.1.    Initial Mobilisation

The Company shall be responsible for mobilisation of the Drilling Unit (and other Contractor Group Equipment and the Contractor Group Personnel) from the Mobilisation Point to the first Well Location.

The Company is also responsible for the supply of anchor handling and towing vessels and crews for such mobilisation of the Drilling Unit, other Contractor Group Equipment and the Contractor Group Personnel is specified in Schedule 3.

### 3.2    Demobilisation From Well Location

The Contractor shall be responsible for demobilisation of the Drilling Unit (and other Contractor Group Equipment and the Contractor Group Personnel) from the final Well Location to the next operator's well location or other location.

The Party responsible for the supply of anchor handling and towing vessels and crews for the demobilisation of the Drilling Unit, other Contractor Group Equipment and the Contractor Group Personnel on completion of the last Well is specified in Schedule 3.

**4.    APPOINTMENT OF CONTRACTOR AND COMPANY REPRESENTATIVES**

**4.1.    Contractor's Representatives**

(a)    The Contractor shall:

(i)    not later than the Actual Commencement Date, designate an individual as its representative on board the Drilling Unit at all times during Drilling Operations;

(ii)    authorise such representative to direct and control the Contractor's performance of the Drilling Operations and to discuss and agree with the Company all matters which relate thereto; and

(iii)    not remove or replace such representative without the prior written consent of the Company such consent not to be unreasonably withheld or delayed.

(b)    The Contractor shall in addition:

(I)    designate a representative onshore at the Supply Base who shall be in overall charge of the Contractor's performance of its obligations under this Contract;

(ii)    authorise such representative to act for and bind the Contractor in all matters relating to the Contractor's performance of its obligations hereunder;

(iii)    notify the name of such representative to the Company at least 15 days before the estimated Actual Commencement Date; and

(iv)    not remove or replace such representative without the prior written consent of the Company.

**4.2    Company's Representative**

(a)    The Company shall maintain a representative on board the Drilling Unit to represent the Company and to liase with the Contractor on all day to day matters which arise between the Contractor and the Company hereunder.

(b)    For the avoidance of doubt, it is expressly acknowledged that the Company's Representative on board the Drilling Unit shall not have authority to agree to any amendment or variation of any of the terms or provisions of this Contract or to waive any of the rights, duties or liabilities of the Parties and no action of the Company's Representative shall have any such effect.

(c)    The presence of the Company's Representative on board the Drilling Unit shall not relieve the Contractor from any of its obligations and liabilities under this Contract.

(d)    The Company shall notify the name of such representative to the Contractor not later than the Actual Commencement Date.    Any subsequent changes shall be notified by the Company to the Contractor as soon as reasonably practicable.

**5.    DRILLING OPERATIONS**

**5.1.    Provision of Drilling Unit, other Contractor Group Equipment and Contractor Group Personnel**

(a)    The Contractor shall furnish the Drilling Unit together with other equipment, materials, supplies and services detailed in Schedules 1 to 3 and the personnel detailed in Schedule 4 in order to be able to carry out the Drilling Operations in accordance with the Drilling Programme and this Contract.

(b)    The Contractor shall provide rig move procedures and such procedure will be submitted to the Company for approval at least fifteen (15) days prior to the Drilling Unit's mobilisation from the Mobilisation Point.

**5.2.    Provision of Drilling Programme**

The Company shall deliver the Drilling Programme for the first Well to the Contractor and, if necessary, a seabed survey report for the Well Location in good time prior to the Actual Commencement Date.    If applicable, Drilling Programmes for subsequent Wells shall be delivered to the Contractor as soon as reasonably practical.

The Company shall have the right to make changes to the Drilling Programme at any time hereunder on written notice given to the Contractor to that effect.

**5.3.    Commencement of Drilling Operations**

The Contractor shall commence the Drilling Operations promptly after the Actual Commencement Date.

**5.4.    Conduct of Drilling Operations**

The Contractor shall carry out the Drilling Operations on a twenty-four (24) hour per day, seven (7) day per week basis and, except as otherwise directed by the Company, in strict conformity with the Drilling Programme and this Contract.

**5.5.    Compliance with Drilling Programme**

Without prejudice to the generality of Clause 5.4, the Contractor shall in the conduct of the Drilling Operations:

(a)    Mud Programme

    (i)    follow the mud programme specified by the Company and shall account to the Company for all mud fluids as directed by the Company; and

    (ii)    ensure that all drilling fluid used by the Contractor shall comply with the specifications therefore which are contained in the Drilling Programme.

(b)    Casing and Drilling Programmes

    (i)    drill the Well to the depth and set casing of the size and at the depths as specified therefore in the Drilling Programme; and

(ii) test all strings of casing by such methods and in such manner as the Company may require.

(c) Coring (if applicable)

(i) core between such depths as may be required by the Company and shall deliver samples of all cores to such address or other location as the Company's Representative shall designate for such purpose; and

(ii) take all necessary precautions to ensure that only the Company and/or any authorised representatives of the Company shall be allowed access to any such cores or core data.

(d) Measurement of Well Depth

(i) keep accurate measurements and records of all formations encountered during the conduct of the Drilling Operations and shall prepare reports and records relating thereto as requested by the Company or its authorised representatives from time to time; and

(ii) notify the Company immediately if it shall encounter a formation which reasonably appears to be oil or gas bearing and the Contractor shall thereupon:

(a) suspend Drilling Operations for such period as the Company may require to permit the Company to examine such formation; and

(b) save and prepare clean samples of the formations drilled.

(e) Production Testing (if applicable)

(i) perform open hole, cased hole, drill stem or production tests or services as required by the Company from time to time; and

(ii) ensure that all such tests are carried out in accordance with generally accepted international petroleum industry methods and practices.

(f) Course of Well

(i) use all reasonable endeavours to drill the Well without deviating from the limits specified by the Company;

(ii) measure any deviations from the vertical during the course of such drilling and provide the Company with all such measurements and other data derived therefrom or relating thereto; and

(iii) when the measurements carried out by the Contractor pursuant to Clause 5.5(f)(ii) show a deviation from the vertical which is greater than that which is acceptable to the Company, upon receipt of the Company's instructions to that effect, promptly

redrill the hole to a deviation that is acceptable to the Company.

(g)   Protectors

(i)   ensure that all threads on downhole equipment utilised by the Contractor are protected by steel thread protectors;

(ii)   keep thread protectors on all casing until it is run and grease the threads as it is made up with a pipe lubricant acceptable to the Company; and

(iii)   in order to reduce the risk of deterioration of casing the Contractor shall, if required by the Company, use casing wear protectors on the drill pipes.

(h)   Fishing Tools

(i)   provide all necessary fishing tools, accessories and spare parts which are required to effect the recovery of its downhole equipment; and

(ii)   unless otherwise directed by the Company, not permit the running of any downhole tool in the Well unless suitable downhole fishing tools, as determined by the Company, are available.

(i)   Completion or Abandonment of Well

(i)   if the Company shall elect to complete the Well as a future producing well, complete the Well as directed by the Company, including running casing and liner and installing permanent or temporary wellheads; and

(ii)   if the Company elects to abandon the Well, upon the request of the Company promptly remove from the Well and return to the Company forthwith all recoverable casing and tubing, and plug and abandon such Well in compliance with the Company's directions and Applicable Law.

## 5.6   Daily Drilling Report

The Contractor shall prepare and furnish to the Company the Daily Drilling Report. Each Daily Drilling Report shall contain a complete and accurate report of the day's operations, showing a breakdown of the rates applied to the nearest half (½) hour, shall be signed by the Contractor's Representative on board the Drilling Unit, and shall be delivered to the Company's Representative as soon as possible after midnight of the day to which it relates (but in any event no later than 6 am on the following day) for approval and countersignature on behalf of the Company. Any differences of opinion between the Contractor's and the Company's Representatives regarding matters contained in any Daily Drilling Report shall be noted thereon. The Daily Drilling Report (including notices if any) shall be emailed or faxed to the Company's Lagos, Port Harcourt & London offices before 6 a.m. (local rig time) on the following day by the Contractor.

PAD      Wly

6.    **EQUIPMENT, SUPPLIES AND SERVICES**

6.1.        **Drilling Unit**

The Contractor agrees that it is a condition of this Contract that:

(i)    the Drilling Unit is capable of being moved to and from the Well Locations specified by the Company and of drilling to a maximum depth of 4600 meters in a water depth range of 60 to 300 meters, or in shallower water if Contractor accepts that operating the Drilling Unit at such water depth is technically feasible on a well specific basis, and is in every respect capable and suitable for the conduct of the Drilling Operations;

(ii)    the Drilling Unit is constructed pursuant to the classification stated in Schedule 1a and, together with its ancillary equipment and appurtenances shall be maintained in such class throughout the term of this Contract;

(iii)    the Drilling Unit is not scheduled to undergo an inspection of any nature or overhaul which would or might reasonably be expected to interrupt or delay the Drilling Operations (including mobilisation of the Drilling Unit to the first Well Location and demobilisation from the last Well Location), nor does it have any damage or defects which will or might reasonably be expected to necessitate repairs to the Drilling Unit within the term of this Contract; and

(iv)    the Drilling Unit and all other Contractor Group Equipment is in good working order and shall be maintained in such state so as to permit the continuous and efficient performance of the Drilling Operations throughout the term of this Contract.

6.2.        **Inspection of Drilling Unit and other Contractor Group Equipment**

(a)    Inspection requirements for drill pipe, drill collars, and other downhole tools

(i)    The Contractor shall carry out a complete inspection of all drill pipe, HWDP and drill collars prior to first use of the same in connection with the Drilling Operations to the standard of OCTG Proctor NS 2 Rev 0 1999 (and all amendments and supplements) at its sole cost. Recent and documented inspection carried out prior to the Actual Commencement Date shall be considered as relevant inspection.

(ii)    Notwithstanding the provisions of Clause 6.2(a)(i), the Contractor shall carry out further such inspections of all drill collars, downhole equipment regularly in use, and drillpipe at the request of the Company should problems with such equipment arise in the course of Drilling Operations. Costs of such inspection including time to lay down and pick up equipment will be at the sole cost of the Contractor except to the extent that the problems arise from the use of the downhole equipment and drill pipe during Drilling Operations under this Contract normal wear and tear excluded.

(iii)    Except as otherwise directed by the Company, all inspections shall include but not be limited to the following tests:

    (aa)    Magnetic particle inspection;

    (bb)    Ultrasonic inspection;

    (cc)    Inside and outside optical inspection;

    (dd)    Gauging of the outside diameter;

    (ee)    Drill pipe tool joint threads and general inspection; and

    (ff)    Drill collars tool joint general inspection and full length magnetic particle inspection.

(iv)    The result of all inspections shall be made available to the Company and the OCTG Proctor NS – 2 inspection criteria followed to accept or reject pipe within the criteria that only new or Premium Class pipe shall be used.

(b)    <u>Hard Banded Drill Pipe</u>

5" drill pipe will be supplied with chromium carbide hardbanding, specification to be approved by the Company.

(c)    <u>Inspection by Company</u>

The Company shall have the right to inspect the Drilling Unit and/or the Contractor Group Equipment at any time, whether prior to the Actual Commencement Date or after, to ensure that same conform to the requirements of this Contract. If applicable, this will include the acceptance tests to be agreed and detailed in Schedule 1b. The Contractor will rectify in a timely manner at its sole cost any deficiencies in same as evidenced by such acceptance tests and which are notified to the Contractor by the Company following any such inspection. Any such inspection by the Company should not relieve the Contractor of any of its obligations set forth elsewhere in this Contract.

6.3.    **Maintenance of Drilling Unit and Contractor Group Equipment**

(a)    The Contractor shall ensure that the Drilling Unit and all other items of the Contractor Group Equipment are properly maintained in good working order and repair throughout the Drilling Operations, all in accordance with the original manufacturers' latest standards and procedures.

(b)    The status of the Contractor's maintenance programme shall be reported on a weekly basis to the Company's Representative. Such report shall highlight, inter-alia, any outstanding maintenance that was planned but which was not completed for any reason together with the Contractor's plan for completing the same.

(c)    The Contractor shall use its best endeavours to carry out and complete any necessary repairs or replacements to the Drilling Unit and other Contractor Group Equipment immediately and in such a

manner as to prevent or minimise any adverse effects upon the Drilling Operations.

(d)    Without prejudice to the foregoing provisions of this Clause 6.3, the Contractor shall provide, store and maintain at all times an adequate number of spare parts and operating supplies to ensure the continuous and efficient operation of the Drilling Unit and of other Contractor Group Equipment.

(e)    The Contractor shall be responsible for arranging delivery of all spare parts and operating supplies from their point of origin to the Supply Base.

### 6.4.    Company Group Equipment

(a)    The Contractor shall afford the Company all reasonable and necessary assistance and facilities at the Mobilisation Point for loading the Company Group Equipment on board the Drilling Unit. Any Third Party costs shall be for Company's account.

(b)    The Contractor shall examine the Company Group Equipment before using the same and shall immediately report to the Company any apparent or visual defects therein in sufficient time to allow the Company to replace the same without delay to the Drilling Operations.

(c)    The Contractor shall during the Drilling Operations and thereafter until such time as the Company Group Equipment shall have been fully off-loaded pursuant to the following provisions of this Clause 6.4:

    (i)    properly store and protect the Company Group Equipment on board the Drilling Unit;

    (ii)   maintain the Company Group Equipment in good condition and repair, provided however that the cost of any third party personnel, replacement or spare parts or materials reasonably and necessarily required so to maintain the same shall be for the Company's account; and

    (iii)  provide the Company with all reasonable and necessary assistance and facilities for offloading the Company Group Equipment from the Drilling Unit in accordance with Clause 6.4(d).

(d)    Unless otherwise agreed between the Parties, on completion of the Drilling Operations the Contractor shall redeliver to the Company all items of the Company Group Equipment prior to the Completion Date. The Company Group Equipment shall be so redelivered by the Contractor in as good condition as when received by the Contractor, fair wear and tear excepted, and shall be accompanied by all relevant documentation properly completed.

### 6.5.    Fuel

(a)    As soon as reasonably practicable following the Actual Commencement Date, the Contractor shall measure the quantity of diesel fuel then on board the Drilling Unit in the presence of the Company Representative.

(b)   With effect on and from the Actual Commencement Date until the Completion Date, the Company shall be responsible for supplying all of the Drilling Unit's requirements for diesel fuel.

(c)   The Contractor shall purchase the inventory of diesel fuel on board the Drilling Unit at the Completion Date at the documented price paid by the Company.   The Contractor shall issue to the Company the appropriate credit note covering said purchase of diesel fuel within thirty (30) days of the Completion Date.

### 6.6.   Lubricants

The Contractor shall be responsible for purchasing all lubricants and greases required by the Drilling Unit and by the Contractor Group Equipment.

### 6.7.   Catering Services

The Contractor shall provide on board the Drilling Unit full catering, laundry and recreational facilities in accordance with the requirements set out in Schedule 8.

### 6.8.   Medical Facilities

The Contractor shall provide on board the Drilling Unit full medical facilities in accordance with the requirements set out in Schedule 8.

## 7.   PERSONNEL

### 7.1.   Qualified Personnel

The Contractor agrees that it is a condition of this Contract that the Contractor Group Personnel are suitably and properly qualified, trained, competent and experienced in all respects to properly perform the duties which will be assigned to them by the Contractor in the conduct of the Drilling Operations in a timely and efficient manner and that there are sufficient numbers of Contractor Group Personnel to so do.   If required by the Company, the Contractor shall verify relevant qualifications of the Contractor Group Personnel.

### 7.2.   Key Personnel

Persons designated as Key Personnel in Schedule 4 shall be fluent in the English language, both oral and written, and shall be capable of communicating effectively with all other Contractor Group Personnel and with the Company's representatives.   The CV's of all proposed Key Personnel shall be submitted to Company at least thirty (30) days prior to the Actual Commencement Date.   The Company shall have the right, in writing stating the reasons therefor, to object to and to require the Contractor to replace forthwith at Contractor's cost and expense any such proposed Key Personnel who, in Company's reasonable opinion, are not suitable.   Key Personnel shall not be replaced without the prior written consent of the Company.

### 7.3.   Good Order and Discipline

(a)   In the performance of the Drilling Operations the Contractor shall maintain strict discipline and good order among the Contractor Group Personnel.

(b)    The Contractor shall ensure that no alcohol, drugs or other prohibited substances shall be taken to or consumed on the Drilling Unit or on the flight to/from the Drilling Unit.

## 7.4.    Replacement of Contractor Group Personnel

The Company shall have the right, in writing stating the reasons therefor, at any time to object to and to require the Contractor to remove forthwith at its own cost and expense any Contractor Group Personnel who, in the reasonable opinion of the Company, are:

a) incompetent or negligent in the performance of their duties; or

b) not suitable to safely and efficiently carry out the duties to which that person may be assigned; or

c) engaged in activities which are contrary or detrimental to the interests of the Company; or

d) not conforming with the relevant safety procedures described in Schedule 7.

## 7.5.    Medical Fitness

(a)    The Contractor shall ensure that all of the Contractor Group Personnel shall have had a full medical examination prior to commencement of the Drilling Operations.

(b)    A registered medical practitioner shall conduct all such medical examinations in accordance with accepted international medical standards and the minimum requirements set out in Schedule 8.

(c)    On request from the Company, the Contractor shall promptly provide the Company's authorised medical representative with a copy of all medical certificates relating to such personnel.

## 7.6.    Survival and Training Courses

(a)    Pursuant to Schedule 7, the Contractor shall ensure that all of the Contractor Group Personnel performing services hereunder shall have attended all survival, safety and operational (including without limitation with respect to well control) training courses required by Applicable Law in the Area of Operations and as is generally consistent with international petroleum industry practice and/or as otherwise required by the Company.

(b)    The Contractor shall, if requested, forthwith produce certificates of completion or attendance for the Company's inspection.

## 7.7.    Transportation of Contractor Group Personnel

The Contractor shall provide or procure transportation for the Contractor Group Personnel, together with such other personnel as may be agreed in writing by the Company, between their home base and the Air Base.

PND    ﺷﺮ

**7.8.**     <u>Medivac of Contractor Group Personnel</u>

The Company shall be responsible for the medical evacuation of Contractor Group Personnel from the Drilling Unit to the Air Base or other suitable onshore location.    The Contractor shall be responsible for the medical evacuation of same therefrom to any other location for medical treatment as required.    Contractor shall have in place during the term of this Contract suitable arrangements with a bona fide company to carry out such medical emergency evacuation.    Notwithstanding the foregoing, the Company may, after prior consultation with the Contractor's Representative onshore, make its own arrangements to evacuate any Contractor Group Personnel from the Air Base (or other suitable onshore) to another location for medical treatment. The cost of such subsequent medical evacuation arranged by the Company shall be reimbursed by the Contractor at documented cost.

## 8.     GENERAL RESPONSIBILITIES OF THE CONTRACTOR

### 8.1.     <u>Standard of Performance</u>

The Contractor agrees that it is a condition of this Contract that it shall perform the Drilling Operations:

    (i)    in a good, diligent, safe and workmanlike manner and with due regard to the protection of the environment;

    (ii)    in accordance with good international oilfield drilling and safety practices including, without limitation, the standards from time to time of the API and IADC; and

    (iii)    with that degree of skill, care and diligence ordinarily exercised by skilled and experienced drilling contractors engaged in similar operations in the same or similar circumstances and conditions.

### 8.2.     <u>Compliance with Instructions</u>

Subject to the Contractor's rights and responsibilities as an independent contractor pursuant to Clause 29, the Contractor shall comply with all instructions and directions issued by or on behalf of the Company on matters relating to the Drilling Operations.

### 8.3.     <u>Health, Safety and the Environment</u>

(a)    The Contractor agrees that it is a condition of this Contract that:

    (i)    as at the date of this Contract it has, and shall at all times during the term of this Contract maintain, a clear and comprehensive health (including substance abuse), safety and environmental policy;

    (ii)    it shall provide the Company with a copy of its health, safety and environmental policy within twenty-four (24) hours after the effective date of this Contract; and

    (iii)    it shall at all times observe and comply with and shall ensure that the Contractor Group Personnel shall be made aware of, observe and comply with the terms of the HSE Policy.

(b)     The Company shall have the right to carry out ad hoc audits of the Contractor's compliance with the provisions of this Clause 8.3. The Contractor shall forthwith rectify at its sole cost any deficiencies which are notified to the Contractor by the Company following any such audit.

## 8.4.     Reporting of Accidents

(a)     The Contractor shall notify the Company forthwith of any accidents or incidents resulting in personal injury to or the death of any person or damage to any property arising out of or as a consequence of the Drilling Operations.

(b)     The Contractor shall promptly thereafter take all necessary remedial action in respect of any such accident or incident and shall prepare such reports thereon as may be required by Applicable Law or as may be required by the Company from time to time.

## 8.5.     Inspections, Measurements and Reports

(a)     The Contractor shall at all times permit the Company and its authorised employees and representatives to inspect the performance or results of any Drilling Operations and of all measurements and tests made in connection with such part of the Drilling Operations.

(b)     The Contractor shall keep accurate measurements and records relating to the Drilling Operations including, but not limited to penetration rate, rotary torque, rotary RPM, pump pressure and strokes for each mud pump and hook load and shall prepare and furnish copies thereof to the Company upon request.

(c)     The Contractor shall furnish the Company's designated representatives with the Daily Drilling Report and any other relevant information requested by the Company in accordance with Clause 5.6.

## 8.6.     Importation

(a)     The Contactor shall be responsible at its own cost for the payment of all duties, import fees and/or taxes which may apply as a result of the obligations of the Original Contract with respect to the initial import to the Area of Operations of the Drilling Unit and associated Contractor Group Equipment that is normally mobilised with a rig including but not limited to spare parts which are or may be required for the purposes of this Contract.  In the event there is a change of Area of Operations to a country other than Nigeria, the cost of all resulting duties, import fees, customs bonds, taxes and the like shall be for Company's account. This shall include all costs related to the import and export of the Drilling Unit and associated Contractor Group Equipment from the existing country of operations to the new country of operations and, if applicable, the re-importation to the original country of operations.

(b)     The Company will provide all such assistance as the Contractor may reasonably require in connection with the performance of the Contractor's obligations under Clause 8.6(a).

(c)     The Contractor shall promptly provide the Company with a complete set of all relevant documentation which the Contractor shall obtain

pursuant to Clauses 8.6(a), together with all such other related information or documentation as the Company shall require.

### 8.7.    Blow-out and Fire Hazard

(a)    The Contractor shall exercise all possible due diligence and care to prevent fire, explosion and blowouts. The Contractor shall have and maintain well control and blow-out prevention equipment procedures. If requested, the Contractor shall provide the Company with copies of such procedures.

(b)    The Contractor shall use blow-out prevention equipment which complies with Applicable Law, Contractor's management/verification system and/or such similar system approved by the Company. Said blow-out prevention equipment shall be configured as required and approved by the Company.

(c)    The Contractor shall at all times maintain well control and blow-out prevention equipment in first class condition.

(d)    The Contractor shall examine and test all blow-out prevention devices as often as necessary and additionally, in accordance with the Company's instructions. Test results shall be noted on the Daily Drilling Report.

(e)    Subject to Clause 8.7(f) below, in the event of blow-out or loss of control, the Contractor shall take all measures necessary to protect the Well and to bring the Well under control.

(f)    Subject always to the offshore installation manager's overall responsibility for the safety of the Drilling Unit and all personnel onboard, the Company shall have the right exercisable at any time to conduct or direct the conduct of blow-out or loss of control operations and to use the Contractor Group Equipment and Contractor Group Personnel during such times to bring the Well under control. The person designated as offshore installation manager is specified in Schedule 4.

### 8.8.    Pollution/Dumping

The Contractor agrees that except for fluids and cuttings originating from any Well which have been authorised by the Company for discharge to the sea, nothing shall be dumped, jettisoned, discharged, spilled or intentionally dropped from the Drilling Unit.

### 8.9.    Removal of Wreck

(a)    If the Drilling Unit or any other item of the Contractor Group Equipment becomes stranded, capsizes, sinks or becomes a wreck or obstruction to navigation, the Contractor shall at its own cost promptly raise and remove the same or otherwise deal with the same as required by the Company in accordance with Applicable Law.

(b)    The fact that the Drilling Unit or any other item of the Contractor Group Equipment is insured or shall have been declared an actual, constructive, compromised or arranged total loss shall not relieve the Contractor from any of its obligations and responsibilities under this Contract.

**8.10    Transportation of Contractor's Equipment**

(a)    The Contractor shall comply with all the Company's requirements regarding delivery of the Contractor Group Equipment to the Supply Base. The Company's requirements include, but are not limited to the following:

(i)    the Contractor shall ensure that the Contractor Group Equipment delivered to the Supply Base is correctly packaged, labelled and documented in accordance with all Applicable Law and the requirements of the Company; and

(ii)    the Contractor shall ensure that the Contractor Group Equipment is suitably packed and protected for onward shipment in suitable classified and certified containers complete with fully certified lifting equipment in accordance with all Applicable Law.

(b)    If any of the Contractor Group Equipment does not comply with Clause 8.10(a), the Company shall not accept delivery of such Contractor Group Equipment and any costs incurred by the Contractor and delays caused by such non-acceptance shall be borne solely by the Contractor.

(c)    The Contractor shall unload and load the Contractor Group Equipment and the Company Group Equipment at the Drilling Unit from and to any transport provided by the Company. The Contractor shall ensure all such Contractor Group Equipment and the Company Group Equipment is handled in a proper and safe manner with particular reference to dangerous or hazardous material.

**8.11    Blow Out Prevention Equipment**

The Contractor agrees that, when the Well is being drilled, deepened, serviced, worked-over, completed and/or re-conditioned:

(a)    blow-out preventers of standard make will, when in accordance with all regulations, requirements and normal and customary practices in the industry, be set on surface casing, or the well-head and installed and tested in accordance with usual practice; and

(b)    it will comply with all API regulations and requirements in respect of fitting storm chokes and other equipment to minimise damage or pollution; and

**8.12    Predrill Planning and Preparatory Work**

Prior to the Actual Commencement Date, the Contractor shall assist the Company in the following predrill planning and preparatory work:

(a)    preparation of any permit applications to the regulatory authorities;

(b)    preparation of any notifications required to regulatory authorities;

(c)    preparation of the bridging documents to cover operations and emergency procedures;

(d)    preparation of the onshore emergency response bridging documents;

(e)    training of key operations personnel for any abnormal or specialised activities;

(f)    implementation of Drilling Unit modifications as required and pressure/function testing of well control equipment;

(g)    any work required to address problems identified in any Drilling Unit inspections performed by the Company and/or any independent survey teams;

(h)    completing any Company or independent environmental audit of the Drilling Unit;

(i)    preparation of an environmental awareness training package in accordance with the Company's Environmental Management System (EMS). An environmental awareness training package may have to be completed by all offshore based personnel and key operations personnel;

(j)    final Drilling Unit mooring and riser analysis (if required); and

(k)    preparation of Drilling Unit move procedures.

9.    **GENERAL RESPONSIBILITIES OF THE COMPANY**

9.1    **Company Group Personnel and Company Group Equipment**

The Company shall provide the personnel, equipment, materials, supplies and services detailed in Schedule 3.

9.2    **Company to Obtain Licences and Approvals**

(a)    The Company shall at its own cost obtain all necessary licences and authorisations required to be obtained by the Company to permit the performance by the Contractor of the Drilling Operations at the Well Location.

(b)    The Company shall advise the Contractor of any restrictions, conditions or limitations contained in any such licences or authorisations which will affect the free right of entry to and/or exit from the Well Location and/or the conduct of the Drilling Operations.

9.3    **Seabed Survey**

Without prejudice to the provisions of Clause 9.2, the Company shall obtain a seabed survey report in respect of the Well Location prior to the commencement of Drilling Operations at such location and shall make the results of such survey available to the Contractor pursuant to Clause 5.2. It is acknowledged that the Contractor will rely on third party information supplied by the Company.

9.4    **Transportation of Contractor Group Personnel and Contractor Group Equipment**

The Company shall provide or procure the provision of:

(a)   air/marine transportation of the Contractor Group Personnel, together with such other personnel as may be agreed in writing by the Company, between the Drilling Unit and Air Base/Supply Base; and

(b)   marine transportation of the Contractor Group Equipment (other than the Drilling Unit) between the Drilling Unit and the Supply Base.

**9.5    Delays in Transporting Contractor Group Personnel**

If the transportation of the Contractor's relief crew between the Air Base and the Drilling Unit is delayed due to adverse weather conditions or by other circumstances beyond the control of either the Contractor or the Company, the Company shall reimburse the Contractor for accommodation and subsistence costs which are reasonably incurred by such relief crew at the shore base during the period of such delay.

**9.6    Unscheduled Transportation**

Notwithstanding the provisions of Clause 9.4, the costs of any unscheduled air or marine transportation which is provided by the Company in respect of the Contractor Group Equipment which has failed or which has broken down, and/or replacement of the Contractor Group Personnel pursuant to the provisions of Clause 7.4, may at Company's discretion be for the Contractor's account.

**9.7    Financial Obligation**

Company shall as from the 1st July, 2006 or such other date as may be mutually agreed, and for the full Contract period, maintain with the Royal Bank of Canada or another bank acceptable to Contractor, a minimum balance of USD 20 million as free and unrestricted liquidity. Contractor shall at all times have the right to audit such account in order to verify the required balance.

**10.    COMPENSATION**

**10.1**   Subject to the following provisions in this Clause 10, the Company shall pay the Contractor, as full compensation for the Drilling Operations and all other obligations under this Contract, the rates, lump sums, prices and fees set forth in Schedule 6.

All such day rates shall be based on a twenty-four (24) hour day and any part thereof shall be pro-rated to the nearest half (1/2) hour.

The Contractor is deemed to have satisfied itself as to the circumstances (including risks and contingencies) affecting the price for the Drilling Operations and/or the cost to the Contractor of carrying out the Drilling Operations and to the correctness and the sufficiency of the rates, lump sum prices and charges specified in this Contract which shall, except insofar as it is otherwise provided in this Contract, cover all its obligations under this Contract and all matters and things necessary for the proper execution and maintenance of the Drilling Operations (including mobilisation and demobilisation operations).

PAS        ᵕᵛᵛ

The rates and payments herein set forth shall be adjusted by the actual documented amount of the increase in Contractor's operating cost and/or taxes if an event as described in a) and b) below occurs:

    (a)    if Company wishes to change the Operating Area from offshore Nigeria and Contractor agrees to such change; or

    (b)    if after the Effective Date there is a change in laws, rules, regulations, legislation or taxes, including the enforcement or interpretation thereof, which changes Contractor's financial burden.

If Contractor's actual and documented operating cost changes by more than 10%, for reasons other than a) and b) above, the Parties shall meet with a view to mitigate such increased costs.

## 10.2 Operating Rate

Subject to the other provisions of this Clause 10, the Company shall pay the Contractor the Operating Rate during the Operational Period.

## 10.3 Standby Rate

The Company shall pay the Contractor the Standby Rate during the Operational Period when:

(a) the Drilling Unit is otherwise ready in all respects to carry out the Drilling Operations at the Well Location, but such Drilling Operations are suspended on the instructions of the Company, waiting on delivery of the Company Group Equipment, failure/loss/damage of the Company Group Equipment, due to downhole problems and/or whilst waiting on weather; or

(b) the Drilling Operations are suspended due to failure/loss/damage of the Contractor Group Equipment caused by the Company Group. In such event the Standby Rate shall apply for a maximum of thirty (30) days. It is agreed that provided Drilling Operations may be completed, subject to acceptance of the Classification Society, but the Drilling Unit may not undertake a sea voyage (other than a short distance to an inshore location) prior to repair or installing such Contractor Group Equipment, then such repair or installation of Contractor Group Equipment shall take place prior Completion Date under this Contract at the Standby Rate or as otherwise agreed.

## 10.4 Moving Rate

The Drilling Unit is moving between Well Locations, from the time the Drilling Unit has its first anchor pulled and until the last anchor is down at next location.

## 10.5 Repair Rate

If at any time during the Operational Period the Contractor is not able to conduct Drilling Operations because of failure, loss, breakdown and/or damage to the Drilling Unit and/or to other Contractor Group Equipment

(except due to acts or omission of Company Group when the Standby Rate shall apply pursuant to Clause 10.3(b)), then, from the cessation of such Drilling Operations until the Drilling Unit is fully repaired and recommences Drilling Operations the Contractor shall be paid the Repair Rate, provided that payment of the Repair Rate shall be:

(a)     conditional upon Contractor informing the Company as soon as practicable following the occurrence of the incident in question, detailing the nature, extent and cause of such failure/loss/breakdown/damage together with the Contractor's best estimate of the duration of the resulting repairs or replacement;

(b)     limited to a maximum period of thirty-six (36) hours per calendar month in respect of the same event or programme of repairs. Thereafter, no day rate shall be payable.

The Repair Rate shall not apply during routine maintenance such as but not limited to replacing the swivel, replacing pump liners, slipping the drill line or lubricating the Drilling Unit, during which time the Operating Rate shall apply.

Unless the Standby Rate applies pursuant to Clause 10.3(b), t he Repair Rate shall not apply at any time during the Operational Period when the Contractor moves the Drilling Unit away from the Well Location for repair in dry dock, port, repair facility or elsewhere.

## 10.6   Force Majeure Rate

The Company shall pay the Contractor the Force Majeure Rate during the Operational Period when Drilling Operations are suspended due to Force Majeure.

## 10.7   Mobilisation and Demobilisation Fees

(a)     No Mobilisation Fee or other remuneration shall be paid by the Company to the Contractor prior to the Actual Commencement Date. The Moving Rate shall apply during the mobilisation of the Drilling Unit from the Mobilisation Point to the first Well Location pursuant to the provisions of Clause 3.1.

No Demobilisation Fee or other remuneration shall be paid by the Company to the Contractor after the Completion Date.

## 10.8   Reduced Standby Rate

(a)     The Company shall have the option to serve notice on the Contractor that it does not intend to conduct any Drilling Operations with the Drilling Unit for a period of at least thirty (30) consecutive days. If the Company serves such notice, it shall not require the Contractor to resume Drilling Operations on the Well Location upon less than fifteen (15) days notice.

(b)     If the Company shall serve any such notice, described in Clause 10.8(a), it shall pay the Contractor at the Reduced Standby Rate from the date and time that the Drilling Unit is either moored or jacked up in port or forty-eight (48) hours after the time such notice is received, whichever is earlier, until either the last anchor is racked or the Drilling



Unit is jacked down and under tight tow in port or recommences Drilling Operations on the Well Location, whichever is later.

## 10.9  Zero Day Rate

Except as expressly otherwise stated herein, the Contractor shall not be entitled to any day rate or other remuneration during the Operational Period when the Contractor is for any reason not able to conduct Drilling Operations in accordance with the Drilling Programme when the Contractor is in breach of its obligations under this Contract.

## 10.10  Rate Conflict

The Parties recognise that in given situations more than one day rate may apply. In any case where two or more day rates could apply to a given situation, the Parties agree that the Contractor shall be paid at the lowest applicable day rate.

## 10.11  Reimbursable Items

The services and equipment to be provided by the Contractor and reimbursed by the Company at documented cost with or without a handling charge are specified in Schedule 3.

## 11.  INVOICING AND PAYMENT

## 11.1  Submission of Invoices

(a)     The Contractor shall invoice the Company within seven (7) Working Days after the end of each calendar month with respect to the amount of any compensation to which it may be entitled as a consequence of Drilling Operations performed and reimbursable expenditure incurred during the preceding month.

Any mobilisation and/or demobilisation fees may be invoiced by the Contractor as detailed in Schedule 6

(b)     Invoices shall be sent to the address specified in Schedule 6. All invoices shall reference this Contract, the nature of the operations in respect of which payment is requested and shall be supported by such documentary evidence as the Company shall reasonably require to verify the correctness of the items invoiced.

## 11.2  Payment By Company

(a)     Except as otherwise stated herein, the Company shall pay all sums due to the Contractor hereunder within thirty (30) calendar days after receipt by the Company of the Contractor's invoice given under Clause 11.1.

(b)     The making of any payment by the Company pursuant to this Clause 11.2 shall be without prejudice to the Company's rights under this Contract, nor shall it be deemed to constitute acceptance by the Company of defective work.

(c)     On the first working day of each month Company shall make an advance payment of USD three (3) million. Such payment shall be reconciled and deducted by Contractor from Contractor's invoice for the same month.

### 11.3  Disputed Invoices

In the event of Company disputing any item of an invoice, Company shall, within twenty (20) Working Days following receipt of such invoice, notify Contractor of the item in dispute and specify its reasons for dispute. Both Company and Contractor shall confer in good faith to resolve the disputed amount. Payment in respect of such item in dispute shall be withheld until settlement of the dispute.

The Company will pay the undisputed amount as set out in Clause 11.2.

Disputed amounts eventually agreed payable and all undisputed amounts shall bear interest at the rate of two (2) percent over LIBOR (London Interbank Offering Rate) from thirty (30) days after receipt by Company of the relevant initial invoice and until payment has been made.

## 12.  CUSTOMS, DUTIES AND TAXES

12.1  Unless otherwise specified herein, the Contractor shall be responsible for and shall indemnify, defend and hold harmless the Company Group against all import or export charges or customs or excise duties, taxes and fees including, without limitation, local sales taxes, VAT, clearing agents' fees or other similar taxes or fees which are levied on the Contractor Group Equipment or on the personal property of the Contractor Group Personnel.

12.2  The Company shall be responsible for and shall indemnify, defend and hold harmless the Contractor Group, against all import or export charges or customs or excise duties, taxes and fees including, without limitation, local sales taxes, VAT, clearing agents' fees or other similar taxes or fees which are levied on the Company Group Equipment or on the personal property of the Company Group Personnel.

12.3  The Contractor shall, and shall procure that the Subcontractors shall, report, file and pay any and all income, corporation, revenue or similar taxes, howsoever described, and all fines, penalties and interest thereon duly assessed on the income, profits and gains accruing to the Contractor or any Subcontractor in performance of the Contract. The Contractor shall defend, indemnify and hold harmless the Company Group from and against any and all Claims relating to taxation howsoever arising in connection with said income, profits and gains of the Contractor or any Subcontractor.

12.4  The Contractor shall defend, indemnify and hold harmless the Company Group from and against all taxes assessed or levied against or on account of wages, salaries or other emoluments, income or deemed benefits paid to any member of the Contractor Group Personnel, or any social security payments payable in respect of the Contractor or any member of the Contractor Group Personnel.

### 12.5  Withholding Tax

The Company may withhold sums from payments to be made by the Company to the Contractor or to any Subcontractor to the extent that such withholding may be required by Applicable Law, orders, rules or directions of any competent taxing authority. Unless otherwise specified, the rates and prices set forth in Schedule 6 are before the application of any withholding taxes.

Where the requirement for any withholding is avoided by the Contractor or any Subcontractor holding an appropriate exemption certificate it is the duty of the Contractor to inform the Company that such a certificate is held, prior to any payment being made, and to inform the Company of any change to or cancellation of the certificate and to provide copies of the certificate or any further information that may be required by the Company to satisfy it that it can avoid any withholding. The Contractor shall defend, indemnify and hold the Company Group harmless from and against any and all Claims arising in connection with such withholding or failure to withhold as may arise due to the Contractor's failure to inform the Company of any relevant matter in a timely fashion.

The Company shall supply any certificate of such withholding as is required by law.

## 12.6   VAT

Unless otherwise specified, the rates, lump sums, prices and fees set forth in Schedule 6 are exclusive of VAT. To the extent that VAT is applicable to the amounts invoiced by Contractor, Contractor shall include VAT on its invoices as required by the laws and regulations pertaining to said VAT. Contractor shall pay the VAT in accordance with the Applicable Laws and regulations and provide the VAT receipt(s) to Company.

## 12.7   Reimbursements

In relation to any costs to be compensated by the Company on a reimbursable basis in accordance with this Contract, the Company shall have no liability to reimburse the Contractor for any portion of such costs which are eligible for tax relief, reduction, exemption or recovery by the actions of the Contractor or any Subcontractor.

## 13.   LIABILITIES AND INDEMNITIES

## 13.1   Interpretation

Notwithstanding anything expressed or implied in this Contract to the contrary:

(a)   Where in this Contract a Party gives an indemnity, such indemnity shall extend to any and all liabilities, damages, charges, fines, penalties, costs and expenses incurred or payable in connection with or in consequence of the Claim including, but without limitation:

    i)   liabilities or damages, not excluding punitive or exemplary damages, admitted, determined or awarded or agreed in any settlement or compromise;

    ii)   charges, fines and penalties levied or imposed by any person or body having jurisdiction and power so to do; and

    iii)   reasonable and proper costs and expenses, including but without limitation legal costs and expenses on a full indemnity basis and the cost of the time spent on the Claim by the personnel of the indemnified Party, whether or not the Claim is successfully resisted or defended.

(b)   Where in this Contract a Party gives an indemnity, such indemnity shall extend, apply and be enforceable regardless of the cause or

causes of the event giving rise to the Claim and in particular but without limitation, shall extend, apply and be enforceable notwithstanding that a cause or the cause may be:

i)   the negligence (whether sole, contributory or gross), fault or default of;

ii)  the breach of contract (whether breach of condition or warranty), repudiation of contract or misrepresentation (whether innocent or negligent, but not fraudulent) by;

iii) any breach of duty (statutory or other and whether or not involving fault) or failure to comply with any Applicable Law on the part of

the person or body so indemnified.

(c)  .  The indemnities given by the Company to the Contractor Group in this Contract may be enforced by the Contractor against the Company for the benefit of the Contractor Group and/or Contractor Group Personnel.

(d)  The indemnities given by the Contractor to the Company Group in this Contract may be enforced by the Company against the Contractor for the benefit of the Company Group and/or Company Group Personnel.

(e)  Where in this Contract a Party gives an indemnity, such indemnity shall extend, apply and be enforceable as a fundamental obligation of that Party without prejudice to any right whatsoever of any insurer or any right of any person who is not a Party.

(f)  In the case of injury to or sickness, disease or death of the Company Group Personnel, the Contractor Group Personnel or any Third Party, the provisions of Clauses 13.2 and 13.8 shall take precedence over the provisions of Clause 14.

**13.2  Sickness, Disease, Injury or Death of Personnel**

(a)  The Company shall indemnify, hold harmless and defend the Contractor Group and the Contractor Group Personnel against any and all Claims arising in respect of injury to or sickness, disease or death of any Company Group Personnel in relation to or in connection with this Contract.

(b)  The Contractor shall indemnify, hold harmless and defend the Company Group and the Company Group Personnel against any and all Claims arising in respect of injury to or sickness, disease or death of any Contractor Group Personnel in relation to or in connection with this Contract.

**13.3  Physical Property**

(a)  The Company shall indemnify, hold harmless and defend the Contractor Group and Contractor Group Personnel against any and all Claims in respect of loss of or damage to physical property of the Company Group and Company Group Personnel and arising out of or in connection with this Contract.

P AD

(b)     The Contractor shall indemnify, hold harmless and defend the Company Group and the Company Group Personnel against any and all Claims in respect of loss of or damage to physical property of the Contractor Group and Contractor Group Personnel arising out of or in connection with this Contract.

### 13.4    Contractor's Down-hole Equipment Below the Casing Hanger

(a)     Notwithstanding the provisions of Clauses 13.1(b) and 13.3(b), the Company shall be liable to the extent set out below in respect of loss of or damage to the Contractor Group's down-hole equipment, arising out of or in connection with this Contract, when said down-hole equipment is in-hole below the casing hanger, except where any such loss or damage is contributed to or caused by normal wear and tear, or by the negligence (statutory, contractual or otherwise) in any form of, or by the failure to observe good oilfield and drilling practices by, the Contractor Group or Contractor Group Personnel.

(b)     For the purpose of clarification, it is understood that blow-out preventors and associated equipment are not subject to this Clause 13.4 and are subject to Clause 13.3(b) above.

(c)     In the event that the Contractor makes a claim under this Clause 13.4, the Contractor shall submit to the Company a fully documented request for reimbursement in accordance with any applicable provisions of this Contract together with independent third party supporting evidence for the amount of such claim.

(d)     The Company's liability under this Clause 13.4 shall be limited to the lower of the following amounts:

   (i)     reasonable repair costs; or

   (ii)    replacement purchase price depreciated at the rate of two percent (2%) per month from the date the equipment was first taken into use to a maximum depreciation of seventy percent (70%).

### 13.5    Emergency Operations

(a)     Without prejudice to the provisions of this Clause 13 and Clause 14, at all times of emergency (including but not limited to a Well out of control) arising out of or in connection with this Contract, the Company may by notice request and in such event the Contractor shall permit the Company to assume control of any and all work necessary to contain and end such emergency pursuant to Clause 8.7(f).

(b)     Throughout any such emergency, the Contractor shall make its personnel and physical property available as required by the Company, provided that the Contractor shall retain control of the marine functions of its vessels, including for this purpose and without limitation the Drilling Unit.In the event Company assumes control pursuant to Clause 13.5 (a) and any relief well is required to be drilled as a result of such emergency or the Drilling Unit is otherwise required to remain at the Well Location, the Company shall reimburse Contractor any documented additional cost as a result thereof, such as

PAD    ytm

but not limited to, additional insurance premiums and additional payroll costs of Contractor Group Personnel.

## 13.6    Well Damage, Blow-out, Crater and Associated Pollution

Subject to Clauses 13.2, 13.3, and 13.4, the Company shall indemnify, hold harmless and defend the Contractor Group and Contractor Group Personnel against any and all Claims in respect of:

(i)     loss of or damage to the Well, subterranean geological formation, strata and/or oil or gas reservoir;

(ii)    loss of products resulting from a blow-out, crater, catching fire or the Well in any manner getting beyond control;

(iii)   killing or bringing under control of the Well;

(iv)    pollution, containment and clean-up resulting from Clauses 13.6 (i), (ii) and (iii) above;

(v)     pollution, containment and clean-up resulting from loss or damage to the Company and Contractor Group Equipment;

(vi)    injury to or sickness, disease or death of any Third Party person or loss of or damage to any property of a Third Party resulting from a blow-out, crater, catching fire or the Well in any manner getting beyond control

arising out of or in connection with this Contract, save that notwithstanding Clause 13.1(b):

in the event that such loss or damage set out in Clause 13.6(i) is caused by the default or negligence (statutory, contractual or otherwise) in any form or by the failure to observe good oilfield and drilling practices by, any member of Contractor Group and/or Contractor Group Personnel, the Contractor shall, at the request of the Company provided the Drilling Unit is still on the Well Location, either drill the same or an equivalent hole to the same depth as such hole had been previously drilled or repair such damaged hole or well to its original state excluding any Company Group provided equipment at Redrill Rate; and

in the event that the blow-out, crater, catching fire or other loss of control of the Well is wholly or principally due to the default or negligence (statutory, contractual or otherwise) in any form or by the failure to observe good oilfield and drilling practices by, any form of any member of Contractor Group and/or Contractor Group Personnel, the Redrill Rate shall apply during the period required to regain control of the Well.

## 13.7    Pollution From Contractor Group Equipment

Except as otherwise provided in this Clause 13, the Contractor shall assume all responsibility for, including control and removal of, and shall indemnify, hold harmless and defend the Company Group against any and all Claims in respect of any pollution, contamination or waste matter emanating or originating from the Contractor Group Equipment such as, but not limited to,

fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage wholly in Contractor Group's possession and control.

**13.8    Third Party**

Except as otherwise provided in this Clause 13 all Claims in respect of injury to or sickness, disease or death of any Third Party person or loss of or damage to any property of a Third Party arising out of or in connection with this Contract shall, as between the Company and the Contractor, be borne in proportion to what their respective legal liabilities (if any) in the law of negligence are or would be in respect of the incident in question.

**13.9    Liens**

(a)    The Contractor shall not claim, and shall procure that no member of the Contractor Group shall claim, any lien, charge or the like on or over the Drilling Operations or on any property of the Company Group, including, but not limited to any property of the Company Group which is within the control or possession of the Contractor Group or on or within the Area of Operations.

(b)    Upon receipt of a notice from the Company, the Contractor shall discharge or cause to be discharged all liens, charges or other encumbrances other than mortgages or other securities held by banks or other financial institutions as part of Contractor's business attaching to or upon any of the:

(i)     Contractor Group Equipment; or
(ii)    (where such liens, charges or encumbrances have arisen as a result of the actions of any member of the Contractor Group) equipment provided by the Company Group for use for or in connection with the performance of the Drilling Operations

which, in either case, in the reasonable opinion of the Company, may adversely affect the performance of the Contractor's obligations under this Contract.

(c)    The Contractor shall indemnify, hold harmless and defend the Company Group against any and all Claims, in respect of such liens, charges or other encumbrances in connection with or arising out of the Contract as detailed in Clause 13.9 (a) and which are not discharged.

(d)    If at any time there is evidence of any lien, attachment, charge or claim to which, if established, any member of the Company Group or its property might be subjected, whether made by any persons against the Contractor or made by any Subcontractor or person alleging to be a Subcontractor against the Company, then the Company shall have the right to withhold and/or set off or otherwise recover from the Contractor such sum of money as will fully indemnify the Company Group against any such lien, attachment, charge or claim.

(e)    Before withholding any payment due to the Contractor in accordance with Clause 13.9(d), the Company shall give to the Contractor a reasonable opportunity to demonstrate that the purported lien, attachment, charge or claim is either unenforceable or is covered by the provisions of an enforceable policy of insurance.



### 13.10  Well Abandonment

Notwithstanding the provisions of Clauses 13.1(b) and 13.6, if the Well has to be plugged and abandoned due to any member of the Contractor Group's or any member of the Contractor Group's Personnel's sole default or negligence (statutory, contractual or otherwise) whilst the Contractor is working on such Well, the Company may require the Contractor to drill a new Well in replacement at the same location or adjacent thereto at the Redrill Rate, until the depth is reached of the original Well's abandonment.

### 13.11  Claims

If either Party becomes aware of any incident likely to give rise to a Claim, it shall notify the other Party as soon as practicable and both Parties shall co-operate fully in investigating the incident.

### 13.12  Salvage and General Average

Notwithstanding the provisions of Clause 13.8, the Contractor shall indemnify, hold harmless and defend the Company Group and Company Group Personnel against any and all Claims in respect of injury to or sickness, disease or death of any Third Party person or loss of or damage to any property of a Third Party arising out of any salvage and rescue operations in connection with this Contract and relating to Contractor Group's property.

### 14.    CONSEQUENTIAL LOSS

**14.1**  Subject to the provisions of Clause 13.1(f), the Company shall indemnify, hold harmless and defend the Contractor Group and the Contractor Group Personnel against any and all Claims arising in respect of any Consequential Loss arising out of or in connection with this Contract, suffered by the Company Group or Company Group Personnel.

**14.2**  Subject to the provisions of Clause 13.1(f), the Contractor shall indemnify, hold harmless and defend the Company Group and Company Group Personnel against any and all Claims arising in respect of any Consequential Loss arising out of or in connection with this Contract, suffered by the Contractor Group or Contractor Group Personnel.

### 15.    INSURANCE

### 15.1  Minimum Insurances

Without prejudice to the liabilities, indemnities and obligations of Contractor under Clauses 13 and 14, the Contractor shall effect and maintain, and shall ensure that the Subcontractors shall effect and maintain, throughout the term of this Contract, insurance policies which shall include but shall not be limited to the minimum types and amounts set out in this Clause 15. The Contractor shall indemnify, hold harmless and defend the Company Group against any and all excesses, deductibles or franchises incorporated therein.    All insurance policies effected by the Contractor and the Subcontractors shall name the Company and/or the Company Group as an additional assured with cross liabilities provisions, where appropriate.

PAD

### 15.2    Certificates of Insurance

(a)    The Contractor shall provide the Company with certificates of insurance, endorsed by the Contractor's insurers or brokers, within seven (7) days of the effective date of this Contract, unless a current certificate has already been provided. Updated certificates will be provided on the renewal anniversary of all policies required hereunder.

(b)    Failure by the Contractor to provide such a certificate may be taken by the Company to indicate that the Contractor has failed to meet its obligations to provide the required insurance under this Contract.

### 15.3    Material Changes

The Contractor shall give notice to the Company immediately in the event of cancellation or material change affecting any insured party's interest in respect of the insurances set out in this Clause 15.

### 15.4    Cancellation or Failure to Maintain

If any insurance policy is cancelled or if the Contractor and/or the Contractor Group shall fail to effect or maintain any insurance policy which it is required to effect or maintain, the Company may at its discretion effect and maintain any such insurance or additional insurance as it shall consider necessary or desirable in the circumstances and the Contractor shall promptly reimburse to the Company (or the Company may set off against the Contractor's invoices) the full cost of any such insurance or additional insurance.

### 15.5    Waivers of Subrogation

For liabilities assumed by Contractor hereunder, all legal liability policies required under this Clause 15 shall contain an agreement from the insurers to waive their rights of subrogation against the Company Group and Company Group Personnel.

### 15.6    Priority of Insurance

Contractor Group insurance policies required under this Clause 15 shall be primary to any other insurances effected by Company Group and which may overlap in quantum and/or terms and conditions.

### 15.7    The Contractor's and Sub-Contractor's Minimum Insurance

The following are the minimum insurances which are required of the Contractor under Clause 15.1:

(a)    Insurance in accordance with Workman's Compensation and Occupational Disease Laws to the full extent required by any laws in any jurisdiction in which the Drilling Operations are to be provided and/or contracts of employment for Contractor Group Personnel involved in the provision of the Drilling Operations are entered into;

(b)    Employer's Liability insurance for an amount required by Applicable Law but in no instance less than one and one half million Dollars ($1,500,000.00) per person per occurrence or series of occurrences arising from the one event. Such insurance shall cover all Contractor Group Personnel;

(c)  General Third Party insurance with a combined bodily injury and property damage limit of not less than five million Dollars ($5,000,000.00) per occurrence or series of occurrences arising from the one event;

(d)  Hull and Machinery insurance covering loss of or damage to vessels and/or jack-up barges, including but not limited to loss or damage arising from helicopter operations, War Risks, Riots, Strikes and Civil commotion, in amounts of not less than the insured value and Increased Value insurance of (combined total) for each vessel and/or jack-up barge owned, hired, chartered or borrowed under this or other agreements by the Contractor Group and used in connection with this Contract;

(e)  Protection and Indemnity (P&I) insurance or marine liability insurance equivalent to United Kingdom Mutual Steamship Association (Bermuda) Ltd rules, including Collision Liability and Sistership clauses, removal of wrecks and debris, pollution liability and Tower's Liability, with limits of not less than what is currently insured, $100,000,000.00

(f)  If applicable, Aviation Liability insurance which shall cover aircraft (including helicopters) owned, hired, chartered or borrowed under this or other agreements, supplied by the Contractor Group and used in connection with this Contract, with a combined bodily injury and property damage limit, including passenger liability, of not less than fifty million Dollars ($50,000,000.00) per occurrence or series of occurrence arising from the one event; and

(g)  Motor Vehicle Liability insurance, which shall comply with Applicable Law with respect to vehicles used in connection with this Contract.

The Contractor shall procure that the Subcontractors shall effect and maintain appropriate and applicable insurances.

## 16.  FORCE MAJEURE

16.1  A Party shall not be considered to be in default in the performance of its obligations hereunder if and to the extent that such performance is delayed or temporarily prevented by Force Majeure.  Both Parties shall use their reasonable endeavours to avoid, circumvent or overcome the circumstances of Force Majeure.

16.2  The Party affected by Force Majeure shall give the other Party written notice thereof without delay, but not later than forty-eight (48) hours after having been so affected. Such notice shall contain full particulars of the Force Majeure event, together with that Party's best estimate as to the likely duration thereof. The failure to give any such notice shall preclude such Party from claiming Force Majeure.

16.3  Following notification of Force Majeure in accordance with Clause 16.2, the Parties shall meet without delay with a view to agreeing a mutually acceptable course of action to minimise any effects of such Force Majeure.

16.4  Without prejudice to the provisions of Clause 21.3(f), the Party affected by the Force Majeure event shall use all reasonable endeavours to remedy the

situation without delay and shall resume performance at the earliest possible date.

## 17.  CONFIDENTIALITY

17.1  The Contractor shall, and shall ensure that each member of the Contractor Group and Contractor Group Personnel shall, treat as strictly confidential and shall not, without the Company's prior written consent, sell, trade, use, reproduce, copy, divulge or disclose to, place at the disposal of or use on behalf of any third party or, except to the extent necessary for performance hereunder, make use of any of the Company's proprietary technical information or of any other information about the Drilling Operations or the operations to which the Drilling Operations pertain.

17.2  The Contractor shall at no time without the prior written consent of the Company make any publicity releases or announcements concerning the subject matter of this Contract.

17.3  The provisions of this Clause 17 shall not apply to any information which:

(a)  is lawfully in the Contractor's possession prior to the award of this Contract and which is not subject to any obligation of confidentiality owed to the Company; or

(b)  is in the public domain through no breach of the obligations set out in this Clause 17; or

(c)  is received from a third party whose possession and right to disseminate such information is lawful and who is under no obligation not to disclose; or

(d)  is required to be disclosed in order to comply with the requirements of any law, rule or regulation of any government, regulatory body having jurisdiction over the Area of Operations, or the Contractor or of any stock exchange on which the shares of a Contractor Group member are listed, provided the Contractor shall notify the Company of the requirement to make such disclosure prior to doing so.

17.4  The Contractor hereby acknowledges that any data, papers, documents, drawings, other printed or written matter, samples, computer software or equipment supplied to it by or on behalf of the Company Group to assist it in the performance of the Drilling Operations or any such items prepared by or on behalf of the Contractor in connection with the performance of the Drilling Operations are the sole and exclusive property of the Company and/or of any other member of the Company Group.  The Contractor shall return to the Company all such items and all copies thereof within thirty (30) days after termination of this Contract.

17.5  The Contractor shall ensure that the provisions of this Clause 17 are incorporated in any subcontract it enters into with any Subcontractor and that all Contractor Group Personnel shall comply with the same.

## 18.  INTELLECTUAL PROPERTY RIGHTS AND PATENT INFRINGEMENTS

18.1  If, as a result of or incidental to the performance of the Drilling Operations under this Contract using Company's Intellectual Property, the Contractor or

any member of the Contractor Group and/or Contractor Group Personnel acquires or discovers any Intellectual Property, the Contractor shall forthwith notify the Company of said acquisition or discovery, giving full details thereof to the reasonable satisfaction of the Company.

18.2    The Contractor will, forthwith on request of the Company and to the fullest extent possible, grant to the Company, or procure the grant to the Company of an irrevocable, world-wide, royalty-free, non-exclusive licence which will enable the Company and/or any member of the Company Group to use said Intellectual Property in its and/or their own operations.

18.3    Subject to and in accordance with relevant laws and regulations, the Contractor will, forthwith at the Company's request but at the Contractor's sole cost and expense, take all necessary steps to patent and/or otherwise protect to the reasonable satisfaction of the Company any Intellectual Property to which the provisions of this Clause 18 apply.

18.4    The Contractor shall indemnify, hold harmless and defend the Company and each other member of the Company Group against any and all Claims for infringement by any member of the Contractor Group and/or Contractor Group Personnel of any Intellectual Property which is owned by a Third Party except to the extent that such Claims result from the use of equipment provided by or used at the instruction of the Company Group

## 19.    ASSIGNMENT AND SUBCONTRACTING

19.1.    The Company may assign all or any part of this Contract, with the prior written consent of the other Party which will not be unreasonably withheld or delayed.

19.2.    Except for an assignment to the Company no assignment by the Contractor shall relieve the Contractor or any member of the Contractor Group or any surety of any of the obligations or liabilities under this Contract prior to the date of the assignment

19.3.    The Contractor agrees that, in the event of any agreed assignment described in Clause 19, it will execute without delay a formal assignment of interest in the Contract to the assignee, to be effective upon the written assumption by the assignee of all obligations of the Company under this Contract.

19.4.    The Contractor shall not subcontract the whole of the Drilling Operations. The Contractor shall not subcontract any part of the Drilling Operations without the prior written consent of the Company such consent not to be unreasonably withheld or delayed.

19.5.    Before entering into any subcontract, whether provided for in this Contract or not, the Company shall be given an adequate opportunity to review the form of the subcontract, the choice of the Subcontractor, the part of the Drilling Operations included in the subcontract and any other relevant details reasonably requested by the Company.

19.6.    No subcontract shall bind or purport to bind any member of the Company Group. Nevertheless the Contractor shall ensure that any Subcontractor shall be bound by and observe the provisions of this Contract in so far as they apply to the subcontract.



19.7.  Each subcontract shall expressly provide for the Contractor's unconditional right of assignment of the subcontract to the Company in the event that the Company terminates this Contract.

19.8.  The Contractor shall be responsible for all work, acts, omissions and defaults of any Subcontractor as fully as if they were work, acts, omissions or defaults of the Contractor.

## 20.    RECORDS AND AUDITS

20.1    The Contractor shall, and shall procure that the Subcontractors shall, maintain a true and correct set of records pertaining to all activities relating to their performance of this Contract and all transactions related thereto. The Contractor shall provide a copy of all Daily Drilling Reports on CD-rom format within thirty (30) days of the Completion Date.

20.2    The Contractor shall, and shall procure that the Subcontractors shall, retain all such records for a period of not less than three (3) years after Completion Date or termination pursuant to Clause 21, whichever is earlier.

20.3    During the term of this Contract and for a period ending three (3) years after Completion Date, the Company or its duly authorised representative shall have the right to audit at all reasonable times and, upon request, take copies of all of the Contractor's records (including data stored on computers), books, personnel records, accounts, correspondence, memoranda, receipts, vouchers and other papers of every kind relating to:

(a)    all invoiced charges on a reimbursable basis made by the Contractor on the Company; and

(b)    any provision of this Contract under which the Contractor has obligations the performance of which is capable of being verified by audit.

## 21.    TERMINATION AND AMENDMENT OF CONTRACT

21.1    The Company, at its sole option, may immediately terminate this Contract, with no further consideration or compensation becoming payable by Company to Contractor except in respect of services provided prior to the date of termination, if the Drilling Unit is lost to the Contractor through confiscation, nationalisation or seizure by the Government or any other authority claiming or having jurisdiction.

21.2    Not Used

21.3    The Company may, by giving notice to the Contractor, terminate this Contract at such times as the Company may consider necessary for any and all of the following reasons:

(a)    if the Contractor is at any time in material breach of any of its substantial obligations hereunder;

(b)    if, following the receipt of a notice from the Company expressing its opinion that the Contractor has failed to perform its obligations under this Contract in a diligent, skilful and workmanlike manner for reasons within the control of the Contractor, the Contractor then refuses to remedy the matter(s) complained of, or fails to take steps to remedy to the Company's reasonable

satisfaction the matter(s) complained of within a period of five (5) days after the notice is received by it, or having so commenced to remedy the matter(s) complained of fails to proceed diligently to so remedy;

(c)     if the Contractor becomes insolvent;

(d)     if the Contractor becomes bankrupt or makes or attempts to make any composition or scheme of arrangement with its creditors or any of them, or, being a company or corporation, passes a resolution for winding up, or an order is made by the Court that the Contractor shall be wound up (other than a voluntary winding up for the purposes of amalgamation or reconstruction), or the Court shall make an administration order in respect of the Contractor, or a receiver or manager is appointed by the Court or the Contractor's creditors or any of them or the Contractor shall become subject to any of the circumstances which entitle the Court or any creditor to appoint a receiver or manager or which entitle the Court to make a winding up order or administration order in respect of the Contractor;

(e)     if Drilling Operations are halted for more than thirty (30) days, or for a cumulative period of thirty (30) days in any period of sixty (60) days, by reason of an event of Force Majeure;

(f)     if a breakdown of the Contractor Group Equipment, unless caused by the actions or omissions of the Company Group, results in the Contractor being unable to perform its obligations hereunder for a consecutive period of thirty (30) days or more; and/or

(g)     if the Drilling Unit becomes an actual, constructive, arranged or compromised total loss, or is damaged to an extent to which it is unsafe for the Drilling Unit to continue to be used to perform the Drilling Operations.

21.4   In the event of the Company giving the Contractor notice of termination of this Contract, the effective date of termination shall be the date specified in the notice, subject to such date complying with the above provisions regarding notice period. If the date specified does not comply with the above notice periods, or no date is specified, then the effective date of the termination shall be the earliest date that the notice can be effective in accordance with the above provisions. When a termination notice becomes effective, the Contractor shall immediately:

(a)     cease performance of the Drilling Operations and take such actions as the Company may require to protect the Well;

(b)     assign to the Company, or its nominee, to the extent desired by the Company all or the relevant parts of the subcontracts relating to the Drilling Operations which the Contractor may have acquired or entered into.

In the event of termination under Clause 21 the Company shall have the right to obtain completion of the Drilling Operations or the relevant part thereof by other contractors at its own costs.

21.5   In the event of termination of the Contract in accordance with Clause 21.3(a), (b), (c), (d), (f) or (g), the following conditions shall apply:

(a)     the Contractor shall cease to be entitled to receive any money or monies on account of the Contract; and

(b)    thereafter and subject to any deductions that may be made under the provision of the Contract the Contractor shall be entitled to payment only as set out in Clause 10 for the part of the Drilling Operations completed in accordance with the Contract up to the effective date of termination.

In the event of termination under Clause 21.3(e) the Contractor shall be entitled to payment as set out in Clause 10 in accordance with this Contract together with such other reasonable costs as agreed between the Parties at the effective date of termination.

21.6    In the event of termination under this Clause 21 the Contractor shall not be relieved of any continuing obligations or liabilities under this Contract.

21.7    The Contractor, at its sole option, may terminate this Contract by giving 10 (ten) days written notice to Company in the event Company fails to make payments of undisputed amounts in accordance with the provisions of the Contract or Company is in breach of its obligation to maintain the required balance of funds, as detailed in Clause 9.7, provided that such notice shall become ineffective by Company's payment of such undisputed amount or if the required balance is re-established within said 10 days period.

In the event the Contract is terminated as aforesaid for non payment of undisputed amounts as detailed above, Company shall be liable to pay Contractor the remaining value of the Contract, calculated as the Standby Rate times the remaining number of days of the duration of the Contract, provided that such claim shall be reduced by any payments received by Contractor for alternative drilling operations for another operator relating to the period for which the claim is made.

In the event the Contract is terminated  due to Company's breach of its obligation to maintain the required balance of funds as stated in Clause 9.7, such termination shall be Contractor's sole remedy hereunder.

## 22.    SUSPENSION OF DRILLING OPERATIONS

If the Contractor shall be in material breach of any substantial provision of this Contract the Company may, without prejudice to any of its other rights under this Contract, immediately suspend the Drilling Operations and not pay Contractor any day rates or other remuneration until Contractor has rectified such breach. Such suspension shall in any event be limited to thirty (30) days.

## 23    NOTICES

23.1    All notices and other communications provided for in this Contract hereunder shall be in writing.  Wherever practicable, all such notices will be given by e-mail or facsimile. Where this is not practicable, notices may be delivered by hand to an authorised representative of the Party to whom directed or shall be sent by registered airmail or (postage and charges prepaid) to the Parties at the following addresses, quoting the relevant Contract number.

All notices herein provided to be given to the Company shall be addressed to:

Equator Exploration Limited

Telephone:    **+44 207 235 2555**
Fax:          +44 207 235 2224
Mobile:       +44 7917 636087
Attention:    Mr. Philip Dimmock
e-mail address: philip.dimmock@equatorexploration.com

In case of technical/operational notices or issues, notices should be given to the Company at the following address:

Equator Exploration Limited

Telephone:    **+44 207 235 2555**
Fax:          +44 207 235 2224
Mobile:       +44 7917 636087
Attention:    Mr. Philip Dimmock
e-mail address: philip.dimmock@equatorexploration.com

Telephone:    +234 (0)1 271 1752
Fax:          +234 (0)1 271 1751
Mobile:       +234 (0)803 535 5312
Attention:    Mr John Munson
e-mail address: John.munson@equatorexploration.com

All notices herein provided to be given to the Contractor shall be addressed to:

Dolphin Drilling Limited

Telephone:    +44 (0)1224 411 411
Fax:          +44 (0) 1224 411 482
Mobile:       +44 (0) 7976 134 593
Attention:    Howard Moles
e-mail address: howard.moles@dolphin-doc.no

Unless otherwise provided herein, notices and other communications shall be deemed received as follows:

(a)   when given by hand, on the day of delivery provided such day is a Working Day and delivery is made at least one hour prior to close of business in recipient's office;

(b)   when given by registered airmail, on the seventh day following date of posting; and

(c)   when given by facsimile, on the day of transmission, provided such day is a Working Day and transmission is made at least one hour prior to close of business in the recipient's office; and

(d)   when given by e-mail, on the day of transmission, provided such day is a Working Day and transmission is made at least one hour prior to close of business in the recipient's office with confirmation of delivery.

PAD            when

## 24. CO-VENTURERS

In the event of the Company entering into this Contract on behalf of itself and the Co-Venturers:

(a)   the Contractor shall look only to the Company for the due performance of this Contract and nothing herein shall entitle the Contractor to commence any proceedings against any Co-Venturer other than the Company; and

(b)   the Company may enforce the Contract for and on behalf of all Co-Venturers as well as for itself. For that purpose the Company may assert any claim or commence any proceedings against the Contractor in its own name to enforce all obligations and liabilities of the Contractor and to make any claim which the Company and/or the Co-Venturers may have against the Contractor.

## 25.   VARIATION

25.1   The Company may at any time by written notice require the Contractor to perform a Variation. The Contractor shall carry out such Variation as directed subject to the following provisions, and provided such Variation are within the Drilling Unit's capability and any additional cost arising therefrom is to the Company's account. For the avoidance of doubt the Company may require the Contractor to make alterations to the Contractor Group Equipment.

25.2   The Company may instruct the Contractor to:

(a)   supply personnel or equipment not specified in Schedules 1a, 2, 3 and 4; and

(b)   make structural alterations to the Drilling Unit subject to the prior approval of the Contractor and the Contractor's insurance underwriters, such approval not to be unreasonably withheld or delayed and provided that the Drilling Unit is reinstated to its original specification at Contractor's sole option prior to the Completion Date.

25.3   Where, in the opinion of the Contractor, a Variation given by the Company is likely to incur additional cost or prevent the Contractor from fulfilling any of its obligations under this Contract or may affect the Drilling Programme, it shall forthwith advise the Company and request it to notify the Contractor within 48 hours, whether or not the Variation should be implemented.

25.4   In the event that the Parties agree that a Variation shall be compensated at reimbursable documented cost, then the handling charges specified in Schedule 6 shall apply.

## 26.   OTHER CONDITIONS

Except as otherwise agreed general or special conditions in any of the Contractor's price lists, invoices, tickets, receipts or other documents presented to the Company or made a part of this Contract by reference are null and void.

## 27.   COMPLIANCE WITH LAW

27.1   Contractor shall observe and abide by, and shall require all members of the Contractor Group and of the Contractor Group Personnel to observe and

abide by, all Applicable Law anywhere and any local customs as may apply to the Area of Operations or in relation to the Drilling Operations under this Contract including, without limitation those Applicable Laws and local customs with reference to the certification of Contractor Group Equipment; and any regulations and decrees enacted thereunder; the manner of conducting operations (including but not limited to Employers' Liability, Workman's Compensation or similar statutory national insurance); and the provisions applicable to Contractor in any collective labour agreement or equivalent signed by Contractor.

27.2    Contractor expressly recognises that non compliance by Contractor of any of the provisions of this Clause 27 may be considered sufficient reason for Company to terminate this Contract subject to Clause 21.3 (b) without any right to compensation except those payments accrued up to the date of termination.

27.3    Subject to provisions of Clause 13 Contractor shall indemnify, defend and hold harmless Company Group against any penalty or other sanction or other Claims which may be imposed on any member of Company Group by the Government or any governmental authority, agency or body by reason of a violation by any member of the Contractor Group or Contractor Group Personnel of any restriction or any failure to comply with any of the foregoing provisions of this Clause 27.

## 28.    PERMITS AND LICENCES

Notwithstanding Clause 9.2 and unless otherwise specified herein, Contractor shall obtain at its own cost from the appropriate authorities all necessary permits and licences required by Applicable Law for the performance of the Contractor of the Drilling Operations and which can only be obtained by the Contractor. Company shall provide all necessary assistance but Company shall in no circumstances be responsible for any failure of Contractor to obtain any such permit or licence or for any consequence of such failure.

Contractor shall obtain and provide at its own expense all visas, passport, working permits, exit and re-entry permits and all other governmental authorisations or documentation required in connection with the entry, presence, employment and/or exit of Contractor Group Personnel. This documentation must be valid during the term of the Contract.

## 29.    INDEPENDENT CONTRACTOR

The Contractor shall act as an independent contractor with respect to the Company. All personnel assigned to the Drilling Operations shall be the Contractor's employees or Subcontractors or employees of Subcontractors and shall not be or deemed to be employees of the Company.

## 30.    WAIVER

None of the provisions of this Contract shall be considered waived by Company unless such waiver is given in writing by Company. No such waiver shall be a waiver of any past or future default, breach or modification of any of the terms, provisions, conditions or covenants of this Contract unless expressly set forth in such waiver. Nor shall any delay or omission on the part of Company in exercising or availing itself of its rights hereunder constitute a waiver of such right.

## 31.    BUSINESS STANDARDS

31.1    The Contractor, in performing its obligations under this Contract, shall establish and maintain appropriate business standards, procedures and controls including those necessary to avoid any real or apparent impropriety or adverse impact on the interests of the Company Group and the Company Group Personnel. The Company reserves the right to review such standards and procedures prior to commencement of, and during the Drilling Operations.

31.2    The Contractor shall review with the Company, on a regular and frequent basis during the term of this Contract, the Contractor's business practices, standards, procedures and controls, including, without limitation, those related to the:

(a)    activities of the Contractor Group and Contractor Group Personnel;

(b)    avoidance of any conflict of interest; and

(c)    prohibition of giving of gifts, entertainment, bribes or favours of any kind.

31.3    The Contractor confirms to the Company that all financial statements, reports and billings rendered to the Company under this Contract shall properly reflect the facts of all activities and transactions handled for the Company's account and Contractor acknowledges that same may be relied upon by Company as being complete and accurate in any further recording or reporting made by the Company for any purpose.

31.4    The Contractor shall notify the Company in writing promptly upon discovery of any failure to comply with this Clause 32.

31.5    The Contractor shall conduct its business in accordance with all Applicable Laws and the commercial customs prevailing in the Area of Operations to reflect a high standard of ethics in all its business transactions and to avoid any unlawful or unethical intervention in the political or other affairs of any country. In this regard:

(a)    no contribution, gift or other incentive shall be made by the Contractor, directly or indirectly, to any political party or candidate in connection with any election campaign for any government office unless such contribution is lawful;

(b)    no contribution, gift or other incentive shall be made by the Contractor to any foreign political party, committee or candidate for public office unless such contribution is lawful in the country where it was made and does not contravene the UK Anti Corruption Legislation as defined below;

(c)    no payment, gift, commission, fee, rebate or other incentive shall be made to or for the benefit of any supplier, customer, government or public official or other business associate of the Company which could reasonably be interpreted as being for the purpose of improperly influencing, inducing or facilitating a business or administrative decision of such supplier, customer, government or public official or other business associate; and

P AD

(d)    the Contractor shall not pay any commissions, fees, nor grant any rebates or incentives to any employee or officer of the Company or of any Contractor's Subcontractor, nor favour said persons with gifts, bribes or entertainment of significant or substantial value, nor enter into any business arrangements with employees or officers of the Company other than with authorised representatives of the Company who are acting on behalf of the Company. The Contractor shall report in writing to the Company any solicitation of commissions, fees or rebates received in connection with this Contract.

31.6    Without limiting the generality of this Clause 32, each Party understands the purposes of the United States Foreign Corrupt Practices Act ("FCPA") and the UK Anti-Corruption Legislation. UK Anti-Corruption Legislation means the Public Bodies Corrupt Practices Act 1889, the Prevention of Corruption Act 1906, the Prevention of Corruption Act 1916 and the Anti-terrorism, Crime and Security Act 2001, Part 12 and any other similar legislation in force at the date of this Contract. Each Party agrees that in carrying out the intent of this Contract, it shall strictly comply with the substance of the FCPA, the UK Anti-Corruption Legislation and any other similar laws and shall not take any action or permit any of its Affiliates or agents to take any action that would violate the substance of the FCPA, the UK Anti-Corruption Legislation or such other similar laws.

## 32.    LOCAL CONTENT

In order to support the Government's policy in promoting the use of domestic product and in order to comply with the Company's obligations under the applicable exploration and production participation agreement, Contractor shall in performing the Services give preference to goods and services sourced from Nigeria provided these are competitive in quality, price and time of delivery.

## 33.    GOVERNING LAW

This Contract shall be governed by, interpreted and construed in accordance with the laws of England. The courts of England shall have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Contract.

## 34.    ARBITRATION

The Parties will attempt in good faith to resolve any dispute or claim arising out of or relating to this Contract promptly through negotiations between their respective senior executives. If the matter is not resolved through negotiation, the Parties will attempt in good faith to resolve the dispute or claim through an Alternative Dispute Resolution ("ADR") procedure as recommended to the parties by the Centre for Dispute Resolution, 7 St. Katharine's Way, London E1 9LB and any party may apply to the Centre for Dispute Resolution for its recommendations as to the appropriate ADR procedure. If the matter has not been resolved by an ADR procedure within 30 days of the initiation of such procedure (or such other period as may be agreed between the parties) or if any Party refuses or ceases to participate in an ADR procedure, the dispute may be referred by any Party to the English Courts.

35. **SURVIVAL**

The rights and obligations of the Parties detailed in this Contract which by their nature survive termination or expiry of the Drilling Operations shall remain in full force and effect after such termination or expiry.

36. **ENTIRE AGREEMENT**

This Contract contains the entire agreement between the Parties in relation to the subject matter hereof and, in the absence of fraud, supersedes any previous understandings, commitments, agreement or representations whatsoever, oral or written (including, for the avoidance of doubt, Contractor's standard terms of sale, service or supply, its price lists, estimates, quotations and work tickets). This Contract shall not be varied except by any instrument in writing executed by the duly authorised representatives of both Parties.


IN WITNESS WHEREOF the Parties hereto have caused this Contract to be executed in two (2) original texts on the date first above mentioned.

Signed for and on behalf of:

**EQUATOR EXPLORATION LTD**

Signature: _P. A. Dimmock_

Name: Philip Dimmock

Position: Chief Operating Officer


**DOLPHIN DRILLING LTD**

Signature: _Iain Mitchell_

Name: Iain Mitchell

Position: SVP Marketing